[Crim. No. 456.   Third Appellate District.—November 7, 1918.]

In the Matter of the Application of MARY M. SELOWSKY for a Writ of Habeas Corpus.

Nuisance—"Red-light Abatement" Act—Injunction—Contempt.—
    Section 6 of the Red-light Abatement Act, prescribing a penalty, as for a contempt of court, for the violation of any injunction provided for in the act, relates to *any* injunction, and includes a perpetual injunction as well as a temporary injunction.

Id.—Decree Abating Nuisance—Omission to Direct Sale of Furniture—Failure to Order Closing of Premises.—A decree under the Red-light Abatement Act, declaring premises to be a nuisance, and enjoining the further maintenance thereof by the defendant or any other person, is not invalid by reason of its failure to direct, as provided by section 7 of the act, the sale of the furniture and the closing of the building against use for any purpose for a year.

ID.—JUDGMENT CONVICTING OF CONTEMPT—RECITAL OF FACTS.—It is only where the alleged contempt is committed in the immediate presence of the court that a judgment in a contempt proceeding must contain a recital of the facts sufficient to show that a contempt has been committed.

ID.—CONTEMPT NOT IN PRESENCE OF COURT.—In the case of a constructive contempt, or contempt not committed in the immediate presence of the court or judge, the affidavits upon which the contempt proceeding is based constitute the complaint, and must contain a recital of facts sufficient to show that a contempt has been committed.

ID.—VIOLATION OF INJUNCTIVE ORDER — SUFFICIENCY OF AFFIDAVITS.— Affidavits in a contempt proceeding under the Red-light Abatement Act held sufficient to charge facts constituting a violation of an injunctive order.

ID.—EVIDENCE—CIRCUMSTANTIAL EVIDENCE.—To prove that a building is maintained for the purposes of lewdness, assignation, or prostitution, circumstantial evidence must necessarily be relied on, direct evidence in support of such a fact being rarely obtainable or available.

ID.—GENERAL REPUTATION.—The fact that a female is a prostitute, or that a house is one where prostitution or assignation is carried on, may be proved by general reputation of the female or of the house in that respect.

ID.—CONSTITUTIONAL LAW.—Section 6 of the Red-light Abatement Act, prescribing a penalty for a violation of an injunction order under that act is not unconstitutional.

ID.—STATUTORY LAW—CONFLICT WITH CODE.—Section 6 of the Red-light Abatement Act neither affects nor is affected by the provisions of section 1209 or 1218 of the Code of Civil Procedure.

ID.—HABEAS CORPUS—LIMITATION OF INQUIRY.—In a *habeas corpus* proceeding, brought to obtain the release from imprisonment of one convicted of contempt for violation of the terms of a decree under the Red-light Abatement Act, the inquiry is limited to the consideration of the question whether the court was, by the affidavits filed, invested with jurisdiction to hear and determine the contempt proceedings.

PETITION for a Writ of Habeas Corpus.

Frank J. Murphy, for Petitioner.

Nathan F. Coombs and Frank L. Coombs, for Respondent.

Uren, Beard & Linn, *Amici Curiae.*

HART, J.—The petitioner has applied for a writ of *habeas corpus* to secure her release from imprisonment following a judgment of conviction of contempt of court, rendered by the superior court of Napa County, for the violation of the terms of a certain decree previously rendered by and entered in said court.

It appears from the petition that on the twentieth day of March, 1917, the district attorney of Napa County filed a petition in the superior court of said county alleging that the petitioner here was using certain premises owned by her and known as the "Stone Bridge Saloon," being situated in Napa County, "for the purpose of lewdness, assignation and prostitution," and praying for a judgment of the court that said premises be declared a nuisance and that the same be perpetually enjoined; that, subsequently (on the twenty-eighth day of June, 1917), a trial was had upon the said petition and the answer thereto of the defendant (petitioner here) and that, on the nineteenth day of November, 1917, the court, upon findings that said premises were owned, in the possession of, maintained and conducted by the petitioner as a place of lewdness, assignation, and prostitution, entered its decree in said action, adjudging and declaring the said premises to be a nuisance and enjoining the further maintenance thereof by the defendant or any other person.

The petition here further shows that, on the twenty-first day of June, 1918, the district attorney of Napa County presented to the superior court of said county a verified petition, together with certain supporting affidavits, charging and alleging the petitioner here (Mary M. Selowsky) with violating the judgment and the injunction above mentioned, and praying for an order and citation directed to her, requiring her to appear before said court and show cause why she should not be punished for contempt of court therefor; that, upon the filing of said petition, an order was made requiring the said Selowsky to appear and show cause before said court on the first day of July, 1918, at the hour of 2 o'clock P. M.; that said order together with a copy of the petition upon which it was made, having been served upon Selowsky, and she having made an answer to the same, a hearing on said petition was had on the day last above named, and on the eighth day of July, 1918, and thereupon the petitioner here was adjudged guilty of contempt of court in violating the

judgment and injunction first above referred to and to pay a fine in the sum of one thousand dollars, and in addition thereto to be imprisoned in the county jail of the county of Napa for a period of six months.

Annexed to and made a part of the petition for the writ here applied for are the judgment adjudging the premises mentioned a nuisance and enjoining the further maintenance of the same and the judgment adjudging the petitioner, Selowsky, guilty of contempt of court in that she violated the injunction and punishing her therefor.

The general proposition submitted for decision here is, of course, that the court below was without jurisdiction to adjudge the petitioner guilty of contempt and to punish her therefor. In support of this general proposition, a number of points are made and presented, and are submitted for decision on the petition for the writ and a demurrer interposed thereto by the respondent upon the general ground that said petition does not state sufficient facts to justify the granting of the writ.

It is contended by the petitioner that, for reasons to be hereinafter considered, the proceeding instituted against her in the superior court for the abatement of the nuisance complained of therein was not inaugurated under the so-called "red-light abatement" statute (Stats. 1913, p. 20), but was brought under the general law of the state authorizing the abatement of nuisances. It is hence argued that, if the petitioner was guilty of contempt of court in that she violated the terms of the injunction issued in said proceeding, she must have been tried and should have been punished for contempt under the sections of the Code of Civil Procedure providing generally for the trial and punishment for contempt of court. (See Code Civ. Proc., secs. 1209–1218, inclusive.) It is further contended that the affidavits upon which the proceeding in contempt was founded do not state facts sufficient to constitute a violation of the injunction order of the judgment in the original action and hence insufficient to have clothed the court with jurisdiction to try and punish the petitioner for contempt; that the facts recited in the judgment in the contempt proceeding do not show that the petitioner violated the terms of the original judgment. It is also claimed that section 6 of the Abatement Act, establishing the measure of punishment for any violation of the decrees entered under the pro-

visions of said act, is unconstitutional, or, at least, in conflict with the law prescribing generally the power of courts in the matter of punishing for contempt, and is, therefore, void.

It would, perhaps, be the more orderly course first to set forth the salient provisions of the Abatement Act.

Section 2 provides that any building or place used for the purpose of "lewdness, assignation or prostitution," or wherein or upon which such acts "are held or occur, is a nuisance which shall be enjoined, abated and prevented as hereinafter provided, whether the same be a public or private nuisance."

The third section provides that whenever there is reason to believe that such a nuisance is kept, maintained, or exists, in any county, etc., the district attorney of said county must, or any citizen of the state, residing within said county, in his own name may, maintain an action in equity to abate and prevent the nuisance and to perpetually enjoin the person or persons so conducting or maintaining the same, and the owner or lessee or agent of the building, or place, in or upon which such nuisance exists, from directly or indirectly maintaining or permitting such nuisance.

Section 4 provides that, when the existence of such nuisance is shown by a verified complaint, or an affidavit, the court or judge may issue a temporary injunction for its abatement.

The sixth section provides the penalty, as for a contempt of court, for the violation or disobedience of any injunction or order expressly provided for in the act, which is not less than two hundred dollars nor more than one thousand dollars, or imprisonment in the county jail for not less than one month nor more than six months, or by both such fine and imprisonment.

Section 7 is as follows: "If the existence of the nuisance be established in an action as provided herein, an order of abatement shall be entered as a part of the judgment in the case, which order shall direct the removal from the building or place of all fixtures, musical instruments and movable property used in conducting, maintaining, aiding or abetting the nuisance, and shall direct the sale thereof in the manner provided for the sale of chattels under execution, and the effectual closing of the building or place against its use for any purpose, and so keeping it closed for a period of one year, unless sooner released, as hereinafter provided. While such

order remains in effect as to closing, such building or place shall be and remain in the custody of the court. For removing and selling the movable property, the officer shall be entitled to charge and receive the same fees as he would for levying upon and selling like property on execution, and for closing the premises and keeping them closed, a reasonable sum shall be allowed by the court.''

Section 9 reads: ''If the owner of the building or place has not been guilty of any contempt of court in the proceedings, and appears and pays all costs, fees and allowances which are a lien on the building or place and files a bond in the full value of the property, to be ascertained by the court, with sureties, to be approved by the court or judge, conditioned that he will immediately abate any such nuisance that may exist at such building or place and prevent the same from being established or kept thereat within a period of one year thereafter, the court, or judge thereof, may, if satisfied of his good faith, order the premises, closed under the order of abatement, to be delivered to said owner, and said order of abatement canceled so far as the same may relate to said property. The release of the property under the provisions of this section shall not release it from any judgment, lien, penalty or liability to which it may be subject by law.'' (Stats. 1913, pp. 20, 21.)

The contention that the original action for the abatement of the nuisance complained of against the petitioner cannot be held to have been brought under the ''Red-light Abatement Act'' is based upon the proposition, pressed by petitioner with apparent earnestness, that the act does not clothe a court of equity with power to grant a perpetual injunction. The argument is that the power perpetually to enjoin nuisances of any kind or character existed in courts of equity long before the passage of said act; that the provision therein giving the courts power to issue perpetual injunctions adds nothing to the power already exercised by courts of equity, and that, therefore, the provision prescribing a penalty for a violation of any injunction or order issued or made in a case arising under said act has reference solely to the violation of the terms of the preliminary restraining order which the law authorizes the court to make upon the filing of a petition for the abatement of the alleged nuisance.

There is no merit in the contention or the argument. The law plainly provides, in the third section thereof, that an action may be brought for the purpose of *perpetually* enjoining the nuisance denounced by the act. The fourth section, properly construed, means that the court may, upon the filing of a verified complaint or affidavit showing the existence of the nuisance, issue a temporary injunction for the purpose of stopping a continuance of the nuisance pending the final adjudication, and section 7 provides for a perpetual injunction upon the establishment of the existence of the nuisance after a trial of the action. The provision of section 6, prescribing the penalty, relates to *any* injunction or order issued or made in the action, and, of course, includes the preliminary as well as the permanent injunction.

But it was further pointed out, in oral argument, in support of the proposition that the action was not instituted under the abatement act, that the judgment entered in said action does not contain the order provided for by section 7 of said act, directing the removal from the building wherein the nuisance is alleged to have been maintained and the sale of "all fixtures, musical instruments and movable property used in conducting the nuisance," nor directing the "effectual closing of the building . . . against its use for any purpose," and so keeping it closed for a year.

One answer to that proposition is to be found in the fact that the complaint and the judgment in the original action closely follow the language of the abatement act, except in so far as that the judgment fails to direct a sale of the personal property, if any, used in the maintenance of the nuisance, and does not order that the building in which said nuisance was alleged and found to have been maintained shall not be used for any purpose for the period of one year. But, as to that provision of the statute, it is to be remarked that, while the language thereof appears to be mandatory, we do not believe that it was intended by the legislature that in all cases, regardless of the particular circumstances thereof, the judgment, to be valid, so far as its injunctive feature is concerned, should contain a direction that the personal property should be sold, or that the building or place where the nuisance was maintained should be closed to all use or for any purpose for the period of one year. Cases under the act may arise which are not so flagrant in the law's violation as in others—as, for

instance, a building may be used by a tenant for the immoral purposes denounced by the statute without the knowledge of the owner thereof and in defiance of his wishes or sentiments regarding such a business. In such a case, it would, indeed, be manifestly unjust to deprive the owner of the building of its use for the period of a year for a lawful and decent purpose. On the other hand, the owner of the building himself might let it for use for the immoral purposes referred to or he might have knowledge that it was being so used, and, for the sake of the compensation received for its use for such purposes, close his eyes to the nuisance and thus tacitly indorse, if not in effect connive at, the maintenance of the same. Thus it is to be observed that the circumstances of all cases arising under the statute may not be similar—some cases calling for decrees as drastic in their effect as the statute will permit and others for a more temperate treatment. It is, therefore, very clear that, if the provisions of the statute as to what the judgment may contain must be held to be mandatory and applied alike in all cases, gross injustice would, in many conceivable cases, necessarily follow the enforcement of the statute. The court would be without discretion to model its decree so that it could be justly appropriate to the peculiar circumstances of certain cases. In other words, the court would be without the power to differentiate between cases arising under the act according to the peculiar circumstances thereof.

The above reasoning is equally pertinent to the proposition that the judgment must direct a sale of the personal property used in connection with the maintenance of the nuisance. Such property might be owned by a person wholly innocent of and, indeed, opposed to the immoral purpose for which it was used, and certainly it would not be a just law that would sanction the confiscation of such a person's personal property.

A judgment similar to the one here was entered in the case of *People ex rel. Bradford* v. *Dillman et al.,* 37 Cal. App. 415, [174 Pac. 951], and, while the question now under discussion was not raised in that case, the judgment therein was, nevertheless, affirmed, the assumption of both the attorneys and the court being, evidently, that the judgment, in substance as well as in form, was one which might appropriately be rendered and entered under the statute.

As to the point that the judgment in the contempt proceeding does not itself show contempt, it may be observed that it

is only where the alleged contempt is committed in the immediate view and presence of the court that the judgment in such a proceeding must contain a recital of facts sufficient to show that a contempt has been committed. In the case of a constructive contempt—that is, where the alleged contempt is committed out of the immediate view and presence of the court or judge at chambers—the proceeding must be inaugurated by the filing of an affidavit or of affidavits, reciting the facts constituting the contempt. (Code Civ. Proc., sec. 1211.)

In *Overend* v. *Superior Court,* 131 Cal. 284, [63 Pac. 372, 374], the court said: "In the case of a contempt committed in the presence of the court, the section (1211, C. C. P.), says that the order adjudicating the contempt must contain a recital of the facts. This provision can only mean that the order must contain a recital of those facts *which, in a case of constructive contempt, the law says must be incorporated in an affidavit.*" (Italics ours.)

But, of course, in the case of a constructive contempt the affidavit or affidavits must contain a recital of facts sufficient to show that a contempt has been committed. Or, as this proposition is stated in *Hutton* v. *Superior Court,* 147 Cal. 159, [81 Pac. 409], "the affidavit or affidavits upon which the contempt proceeding is based constitute the complaint, and unless they, upon their face, charge facts constituting a contempt, the court is without jurisdiction to proceed." (See, also, *Batchelder* v. *Moore,* 42 Cal. 415; *Overend* v. *Superior Court,* 131 Cal. 284, [63 Pac. 372]; *Rogers* v. *Superior Court,* 145 Cal. 91, [78 Pac. 344]; *Frowley* v. *Superior Court,* 158 Cal. 220, 226, [110 Pac. 817]; *Mitchell* v. *Superior Court,* 163 Cal. 423, [125 Pac. 1061].)

The present question, then, is whether the affidavits upon which the contempt proceeding against the petitioner was based show facts sufficient to constitute a contempt.

Two affidavits were filed as the basis of the proceeding— one by John De Vries and the other by E. A. Kelton, sheriff of Napa County. In the affidavit of De Vries it is alleged that, on the first day of May, 1918, affiant visited the building in which the nuisance interdicted by the court's decree was maintained by the petitioner; that, at that time, said building was occupied by the petitioner and two other women; that, at said time, the petitioner sold and served affiant with intoxicating liquors in said building, for which he paid peti-

tioner one dollar, and that the liquors so served in said house were drunk by affiant, the petitioner, who was acting as landlady of said house, and the two other women; "that said building was then and there run, operated and conducted as a house of lewdness, assignation and prostitution by the said Mrs. M. Selowsky; . . . that two of said women, inmates and prostitutes of said house of prostitution; then and there solicited from affiant acts of sexual intercourse for hire, stating that they would commit acts of prostitution with affiant for prices of two dollars for each act of prostitution, and also solicited affiant to stay all night with one of them for the purpose of prostitution for a price of six dollars; that affiant has investigated many houses of prostitution and is familiar with the manner in which houses of prostitution are conducted, and knows of his own knowledge that the aforesaid place was conducted as a house of prostitution, that two of the women were dressed in the garb usually worn by prostitutes in many houses of prostitution, being loose fitting, short dresses, and that said place was conducted only in a manner in which a house of prostitution is conducted."

The affidavit of Sheriff Kelton alleges: "That on the eighteenth day of May, 1918, he, in company with officers of the law, visited the premises belonging to Mrs. M. Selowsky, mentioned and set forth in the judgment in said cause, made, signed and filed herein on the nineteenth day of November, 1917, and that at said time said Mrs. M. Selowsky was still the owner and in charge of said premises, and was keeping and maintaining a house of lewdness, assignation and prostitution, assisted by one Florence Ponta, as follows: That at said time, said Florence Ponta occupied a room at said premises with a man, and affiant verily believes committed with him then and there, the acts of illicit sexual intercourse; that thereafter, and on the same day, said Florence Ponta occupied a room at said premises with another man and, as affiant believes, committed such acts; that said premises set forth in said judgment hereinbefore referred to, and occupied by said Mrs. M. Selowsky, sometimes known as and called Mary M. Selowsky and Mrs. M. Krueger, on the eighteenth day of May, 1918, were in charge of said Mrs. M. Selowsky, and were conducted as a house of lewdness, assignation and prostitution; that Florence Ponta, one of the inmates thereof, is a prostitute, and was working in said house for said Mrs. M. Selow-

sky as a prostitute. That affiant, by reason of his long experience as a sheriff, is familiar with houses of prostitution and knows of his own knowledge that said premises, on said date, were being maintained, conducted and operated by said Mrs. M. Selowsky as a house of lewdness, and that all of said acts of lewdness, assignation and prostitution, committed on said premises, *were committed with the knowledge and approval of said Mrs. M. Selowsky, and for her personal financial gain, and for the purpose of lewdness, assignation and prostitution.*"

The specific objections to the affidavits are that they do not charge that the alleged solicitation of the acts of sexual intercourse referred to therein was carried on with the knowledge of the petitioner; that it is not made to appear therefrom that the women mentioned would or intended to commit the proposed acts of prostitution upon the premises, "or that they solicited affiant to stay all night upon the premises"; that the allegations in the affidavits that the building was at the time mentioned being conducted as a house of prostitution involve the mere conclusions or unsupported opinions of affiants.

We shall not attempt to follow the ramifications of the very able argument advanced in support of the claim that the affidavits, either taken alone or together, do not make out a sufficient case of contempt against the petitioner to have given the court jurisdiction to inquire into the charge. It will be enough to say that, in our opinion, in the character of cases arising under the abatement act, the affidavits sufficiently charge facts constituting a violation of the injunctive order made against the petitioner in the original action and hence a contempt of court.

It is obviously true that, to prove that a building or a house is maintained for the purposes of lewdness, assignation, and prostitution, circumstantial evidence must necessarily be relied upon, for, particularly as to acts of prostitution or assignation, it is rarely the case that direct evidence in support of such a fact may be obtained or is available. Sexual relations between the sexes are, of course, always carried on clandestinely. Such performances, it is to be apprehended, are seldom ever witnessed by persons save those engaged therein. Hence, in proving illicit sexual relations between the opposite sexes, where the proof of such acts is indispensably necessary to the establishment of a case, either civil or criminal,

circumstances sufficiently potent in probative force must always or invariably be wholly relied upon. For instance, it is a crime under section 647 of the Penal Code for any person to live in or about houses of ill fame or to be a common prostitute. To show that a person is a vagrant because he lives in and about houses of ill fame, which generally are houses of prostitution, the character of the house where the accused is charged with living in and about must necessarily be shown. The character of a female charged with being a common prostitute must, of course, be proved, for her character as such is the gist of the charge. Again, a charge based on section 315 of the Penal Code, which penalizes the act of keeping a house of ill fame, resorted to for the purposes of prostitution or lewdness, cannot be sustained without proof that prostitution or lewdness is practiced therein. Neither of these offenses could ever be established if it were requisite under the law to show by positive evidence that specific acts of prostitution had been practiced in the house or by the females. So it is true as to cases arising under the abatement act in which it is essential, to establish the nuisance thereby denounced, to prove that the building or place is maintained for the purposes of lewdness, assignation, or prostitution. While, as we shall later see, lewdness may with little difficulty be shown by direct proof, prostitution or assignation, or the essential acts constituting the same, cannot be so proved. In any of the cases thus referred to the fact that a female is a prostitute, or the fact that a house is one where prostitution or assignation is carried on, may be proved by evidence of the general reputation of the female or of the house in that respect. Indeed, the abatement act, as is also true of section 315 of the Penal Code with reference to the crime therein denounced, expressly provides that such proof is admissible in support of the charge that a nuisance of the character of that at the suppression of which said act is particularly aimed is being maintained in a building or place, and that provision was undoubtedly predicated upon common knowledge of the fact that the specific acts which must of necessity habitually be practiced in a building or house to constitute the nuisance denounced by said act cannot well be proved by direct evidence. No more, so far as the character of the proof is concerned, should be or is required in laying the foundation for a contempt proceeding arising under the abatement act by reason of an alleged viola-

tion of the terms of any injunction or order issued or made thereunder. In other words, if the affidavit or affidavits disclose circumstances from which the conclusion must inevitably follow that the acts constituting the nuisance enjoined by the decree entered in the action for the abatement of said nuisance are carried on in defiance of the mandates of such decree, then they must be held to be sufficient in the statement of a case of contempt, and to invest the court with jurisdiction of the contempt proceeding.

In the present case, as will be noted, the affidavit of De Vries declares that one of the women in the house in question solicited him to have sexual relations with her at a specified price. This was not only of itself an act of lewdness (see Webster's Dictionary; Cyclopedic Law Dictionary), but tended to show that the building or house was carried on as a place of prostitution or assignation. He further declared that he had had considerable experience in the investigation of houses of prostitution and stated without qualification that the place was conducted as a house of prostitution; that liquors were therein dispensed and that the women inmates of the house were garbed in the attire usually worn by prostitutes.

Sheriff Kelton's affidavit states that the petitioner was conducting a house of prostitution at the place in question, assisted by one Florence Ponta, a female; that the latter occupied a room in said house on two different occasions on the day he (affiant) was there with two different men; that said Florence Ponta is a prostitute, and that he verily believes that she practiced sexual acts with the two men referred to; that said acts were committed with the knowledge and approval of said Mary M. Selowsky.

Upon the facts set forth in the affidavits a judgment or verdict would, in our opinion, safely rest in any case where it is legally requisite to prove acts of prostitution or of assignation or of lewdness to establish the ultimate fact or a crime, and if they are sufficient for such purposes, then certainly they are sufficient to show that the decree in the original action was knowingly violated by the petitioner and consequently a contempt of court committed by her.

It is, of course, to be conceded that the *belief* of the affiant that the Ponta woman cohabited and had illicit relations with the two men cannot be accepted as evidence of that fact, but that allegation in the affidavit may be eliminated and still

there remain sufficient facts to show that the building was then being conducted for the purposes of prostitution or assignation, or, at any rate, that lewdness was practiced therein.

We now come to the consideration of the question whether section 6 of the Abatement Act, prescribing the penalty for the violation of the terms of any order or injunction made or issued in an action arising under said act, is or is not valid. As stated above, the contention is that the section is unconstitutional and is in conflict with sections 1209 and 1218 of the Code of Civil Procedure. The same contention was made in *People* v. *Barbiere*, 33 Cal. App. 770–780, [166 Pac. 812–816], and therein we expressed our views upon the question as to the validity of said section of the act. In that case, among other things, it was said: "But we do not acquiesce in the view that section 6 of the abatement law either affects or is affected by the code section referred to. We know of no constitutional limitation upon the right of the legislature to fix reasonable penalties for contempts of the judgments, decrees, orders, or processes of courts of justice, and, in admeasuring such punishments, to assign, as it may do and has done in cases of public crime, to certain acts of contempt a greater or less penalty than is annexed to others, according to the nature of the contempt with respect to the subject matter of the adjudication violated and the consequences of such violation to the public or to individual rights." We have found no occasion to recede from the views thus expressed. Certainly it cannot justly be contended that the legislature may not amend section 1218 of the Code of Civil Procedure by prescribing a more severe penalty for any contempt of court than is now thereby prescribed. If, therefore, section 6 of the Abatement Act is void, it is not because the legislature is without the power and the right under the constitution to prescribe any reasonable penalty it may see fit for contempt in the violation of decrees, judgments, orders, processes entered, made or issued by the courts, or for other misbehavior affecting or militating against the dignity of a court of justice or which is calculated to circumvent the ends of its judicial mandates, but solely for the reason that said section is in conflict with the provisions of section 1218 of the Code of Civil Procedure, to which proposition, as seen, we have expressed an adverse opinion in the Barbiere case.

Counsel for the petitioner says, however: "While contempt of court may consist of a variety of acts, it is always the same offense. Contempt of court is not punished as a crime, strictly speaking, but purely as a vindication of the authority of the court." In support of the proposition last stated by counsel, the case of *Anargyros* v. *Anargyros & Co.*, 191 Fed. 208, and 13 Corpus Juris, pages 4, 5, are cited, but neither of those authorities supports the statement of counsel, but, to the contrary, both distinctly recognize the proposition that there are two general classes of contempt, divided into criminal and civil. The contempt charged here very clearly comes within the category of criminal contempts. As to the proposition first stated by counsel, it is to be observed that the phrase "contempt of court," like the word "crime," is generic, and, as counsel says, embraces within its legal signification a variety of different acts, but such acts involve different elements which, like the different acts constituting different crimes, differentiate the several acts. No one has ever questioned the right of the legislature to fix the punishment for crime according to the gravity of the offense or according to the degree of moral turpitude inhering in the particular criminal act. Why should not the same right be exercised by the legislature in the matter of contempts of court? Should there in reason be meted out to the individual who violates an injunction against hydraulic mining, for instance, the effect of the general prosecution of which industry it has been shown is to destroy thousands of acres of the earth's soil, the direct and fundamental source of all material prosperity and happiness, than to the person who has been guilty of some refractory conduct in the presence of the court, or who has violated, to the damage or detriment of the rights of a single person only, some injunction? The violation of an injunction issued or made a part of the judgment rendered and entered in an action instituted under the Abatement Act involves the commission of acts which have been denounced by the legislature as a crime (Pen. Code, secs. 315, 316), and in this case the petitioner by her act in violating the injunction issued by the court to restrain her from maintaining the nuisance described in the act not only set at defiance a solemn judgment of a court of justice but committed a crime for which she could be prosecuted and punished under the sections of the Penal Code above named. Such a case, it will not be denied, calls for the inflic-

tion of a much more severe penalty than does the case where the contempt grows out of the violation of mere individual rights, in which society generally has only an indirect or a comparatively indifferent interest. It is true that the object of all contempt proceedings is to vindicate the authority of the court as well as to uphold the majesty of the law, yet, as above stated, there are, in their effect upon individual rights as well as upon society, degrees of turpitude in contempts of court which make the variety of acts constituting such contempt as different from each other as petit larceny is from grand.

We read nothing in the case of *Ex parte Clancy,* 90 Cal. 552, 555 et seq., [27 Pac. 411], which conflicts with the foregoing views. In that case, the petitioner had been adjudicated an insolvent debtor under the state Insolvent Act. The petitioner refused to obey an order of the court made in the insolvency proceeding commanding him to turn over and pay to the receiver in said proceeding certain assets of the value of four thousand dollars. He was proceeded against in contempt and was adjudged guilty of contempt of court. Section 64 of the Insolvent Act provided that "all sections of the Code of Civil Procedure of the state of California relating to contempts are hereby made applicable to all proceedings under this act." But it further provided that "an appeal shall be allowed to the supreme court from any order adjudging any person guilty of a contempt of court." In a concurring opinion, joined in by Justice De Haven and Chief Justice Beatty, Justice Harrison held that the provision allowing appeals from judgments of contempt growing out of proceedings had under the Insolvent Act was in conflict with section 1222 of the Code of Civil Procedure, providing that "the judgment and orders of the court or judge, made in cases of contempt are final and conclusive," and remarked: "To give effect to this provision of the insolvent act is to permit an appeal from judgments of contempt in one class of cases which, under the general law applicable to contempts, is denied to all other judgments for the same offense. Such construction would except cases arising in insolvency from the uniform operation of this general law, and thereby destroy its uniformity and violate the provisions of section 11 of article I of the constitution." Judge Harrison further said: "Any law *for the punishment* of this offense is necessarily of

a general nature, and must have a uniform operation. It was not competent for the legislature to provide a *different procedure* for contempts of the superior court committed while in the exercise of its jurisdiction in proceedings for insolvency from that which is provided for those committed while it is exercising its jurisdiction in any other matter.'' It is the language just quoted from which the petitioner derives the notion that the court in that decision held that it is not within the competence of the legislature to fix different penalties for different acts of contempt. But that language cannot be so construed in our opinion. Obviously, the point that Judge Harrison was making, and did make, was that the procedure for proceedings in contempt was required to be the same in all cases and that any law providing punishment for contempt—that is, a law authorizing punishment to be enforced for contempt of court—''is necessarily of a general nature and must have a uniform operation.'' In other words, it is not held by Judge Harrison that, to make the law conform to the constitution, the punishment shall be uniform or the same in all cases.

We have no reason for doubting that the affidavits contain sufficient facts to show that a contempt of court had been committed and to have given the court jurisdiction of this proceeding. What the evidence taken at the trial of the contempt proceeding disclosed, we are not advised by the record before us, nor is it necessary to the decision here that we should know what such evidence showed, since the scope of the inquiry in this proceeding is limited to the consideration of the question whether the court was by the affidavits filed herein invested with jurisdiction to hear and determine the contempt proceeding.

The alternative writ is discharged and the prisoner remanded.

Chipman, P. J., and Burnett, J., concurred.